**HOME BOX OFFICE, INC., Plaintiff,**

v.

**PAY TV OF GREATER NEW YORK, INC., Defendant,**

v.

**TIME, INCORPORATED, Time Television and Communications, Inc., American Television Communications Corporation, Inc., Microband National Systems, Inc. and Microband Corporation of America, Additional Defendants on Counterclaim.**

No. 78 C 2693.

United States District Court, E. D. New York.

March 22, 1979.

**526**

Cravath, Swaine & Moore, New York City (Robert D. Joffe, Calvin R. House, Marc J. Schiller and Rosalyn D. Young, New York City, of counsel), for plaintiff and for counterclaim defendants Time Inc., Time Television and Communications, Inc. and American Television Communications Corp., Inc.

Cowan, Liebowitz & Latman, P. C., New York City (Michael F. Maschio, Roger L. Zissu and Peter R. Porcino, New York City, of counsel), for defendant.

## OPINION

NICKERSON, District Judge.

Plaintiff, a wholly owned subsidiary of Time Incorporated, moves for a temporary injunction in this action brought to recover damages and to restrain defendant permanently from "pirating" plaintiff's television program service and from infringing plaintiff's copyrights. Viewing the facts stated in the affidavits in the light most favorable to defendant, the court concludes that a preliminary injunction should issue.

Plaintiff is in the business of licensing a subscription television program service comprised of plaintiff's copyrighted or licensed motion pictures, sporting events and other special programs. Licensed affiliates in various parts of the country in turn deliver the service to subscribers for viewing on their television sets. The license agreements with plaintiff require the affiliates to maintain appropriate equipment and customer services and to engage in certain promotional efforts.

In the New York City area plaintiff's service is transmitted to some affiliates by a so-called multipoint distribution service consisting of an omnidirectional terrestrial microwave signal. This high frequency signal is transmitted from the Empire State Building and received by the affiliates at authorized points where it is converted into a lower frequency suitable for reception by individual television sets. A receiver and modulator is installed at each apartment building serviced by the affiliate. After modulation the program is then retransmitted by cable or wire to each subscriber, generally by a master antenna. The signal emitted from the Empire State Building,

although not receivable by the general public, can be intercepted by appropriately placed special receivers within an approximate 35-mile radius.

During 1974 and 1975 plaintiff authorized Microband National Systems, Inc. ("Microband"), to distribute the service to such locations in the New York City area as plaintiff might approve. Microband in turn entered into subcontracts to make the actual distribution. Defendant became one of the subcontractors, signing an agreement with Microband dated October 21, 1975. That agreement provided that defendant would have certain "non-exclusive" rights in Queens County but no rights elsewhere and that the term would be for "so long" as Microband's contract with plaintiff "shall remain in effect." Defendant claims that at that time both plaintiff and Microband "caused" defendant to believe that it "would eventually be substituted" for Microband as the wholesale distributor.

Defendant says that it soon became dissatisfied with plaintiff's denials of approval for new locations obtained by defendant after considerable expenditure of money and effort. Nevertheless in December 1975, according to defendant, it had discussions with plaintiff looking toward plaintiff's grant of exclusive rights in Kings and Bronx Counties. Evidently Microband had made it known that it would terminate its agreement with plaintiff as of May 1976.

On March 1, 1976 Microband wrote plaintiff confirming earlier statements and terminating the agreement with plaintiff effective May 7, 1976. The letter stated that Microband's motive in entering into the agreement had been to assist plaintiff in getting master antenna operators into the business and that Microband wished to give plaintiff "sufficient time to finalize arrangements between itself and the operators."

On March 8, 1976 plaintiff sent to defendant a so-called "working draft" of an affiliation agreement to provide the program service in Kings and Bronx Counties. The draft provided that the agreement was to be for five years and that defendant would have certain exclusive rights in the two counties, provided that plaintiff could terminate the exclusive rights in either county on sixty days notice if any other person obtained a cable franchise in that county. An agreement was never signed, and at that time defendant continued to retransmit the service without plaintiff's objection.

Negotiations between the parties continued, and defendant claims that at a meeting on July 19, 1976 defendant's representatives offered to sign an affiliation agreement if it contained the exclusive rights set forth in the March 8, 1976 draft, but that plaintiff then refused to grant those rights. In any event no agreement was reached. Defendant further claims that some time in July of 1976 the parties discussed the possibility of plaintiff's buying out defendant but again came to no agreement.

Sometime around July 20, 1976 plaintiff learned that defendant had expanded its distribution into locations not earlier approved by plaintiff under defendant's subcontract with Microband. Plaintiff protested this expansion but at that time plaintiff acquiesced in defendant's continued distribution at the previously approved locations. Plaintiff says it did so because it still hoped to conclude an acceptable agreement.

By early 1977 no such agreement had been consummated, and on February 17, 1977 plaintiff demanded in writing that defendant cease transmission of the service. Plaintiff did not commence litigation, assertedly because it thought it might yet negotiate an agreement, and defendant continued as before. In the end no agreement was reached, and on August 18, 1978 plaintiff's counsel wrote to defendant advising that its provision of the service without authorization was illegal and an infringement of plaintiff's rights and that legal proceedings would follow if defendant did not cease. This action was brought on December 14, 1978.

Defendant is continuing to retransmit plaintiff's service to some 8000 customers and has been receiving approximately $75,000 a month in subscription fees, none of

which has been paid to plaintiff. Defendant says it will pay plaintiff but only if granted exclusive rights in Kings and Bronx Counties.

Defendant claims that from the first, although plaintiff encouraged defendant to make expenditures for equipment and manpower, plaintiff's true intent was to use defendant merely as an inexpensive way of testing the market until plaintiff could bring a subsidiary into the business, and that plaintiff in violation of the Sherman Act conspired with the counterclaim defendants to that end.

In moving for a temporary injunction plaintiff asserts rights under Section 605 of the Communications Act of 1934, the copyright laws, Section 165.15(4) of the New York Penal Law, and the New York common law of unfair competition.

Section 605, 47 U.S.C. § 605, prohibits any person not entitled to intercept or receive radio communications from doing so and from using "such communication (or any information therein contained) for his own benefit or for the benefit of 'another not entitled thereto." By its terms the section does not apply to the receiving and using of the contents of any communication which is broadcast "for the use of the general public." "Radio communication" is defined by Section 153(b) to include "the transmission by radio of . . . signals, pictures, and sounds of all kinds."

■ Defendant does not deny that Section 605 prohibits an unauthorized person from intercepting the signals carrying plaintiff's program service. The wording of the section proscribes the interception and use of such signals not intended for broadcast to "the general public." *See, e. g., Weiss v. United States,* 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939). Plaintiff has a private right of action for injury arising out of a violation of the section. *Reitmeister v. Reitmeister,* 162 F.2d 691, 694 (2d Cir. 1947).

Here the multipoint distribution service station operates on microwave radio frequencies of such height that the signal is not receivable by conventional television sets until it is modulated by special equipment. The programs are thus intended to be received not by "the general public" but only by paying subscribers. *Cf. Cable Vision, Inc. v. KUTV, Inc.,* 335 F.2d 348 (9th Cir. 1964).

The Federal Communications Commission has concluded that the unauthorized interception of television signals from such a multipoint distribution service violates Section 605. Public Notice dated January 24, 1979. No court appears heretofore to have had occasion to apply the section to television transmissions. But *KMLA Broadcast. Corp. v. Twentieth Century Cig. Vend. Corp.,* 264 F.Supp. 35 (C.D.Cal.1967), relied upon it in enjoining a manufacturer of equipment which intercepted and broadcast multiplex radio transmissions capable of receipt only by special equipment and licensed to a limited audience. There is no reason why the result should be different in the case of television transmissions.

While raising no question as to the applicability of Section 605, defendant contends that plaintiff has consented to defendant's interception of the signal, is guilty of laches in seeking temporary relief, and in any event is sustaining no "irreparable" damage and should therefore be left to a remedy in money damages.

Giving the widest possible latitude to the statements made in defendant's opposing affidavit there is no basis for finding a consent. Defendant admits that the parties conducted negotiations commencing in December 1975 looking toward the execution of a written agreement and that no such agreement was ever concluded. Defendant's consistent negotiating position was that it would sign up only if it got exclusive rights, and plaintiff admittedly refused to accede.

Now defendant claims that it always had the right to use the program service which it unsuccessfully negotiated for so long to obtain. Defendant says that as early as June and September 1975, before it entered into the October 21, 1975 agreement with Microband, plaintiff orally induced defend-

ant to get into the business on the representation that plaintiff would grant defendant exclusive rights in Kings and Bronx Counties. This contention is hardly consistent with defendant's later entry into the written agreement with Microband. That agreement gave defendant no rights in any area other than Queens County, and there the rights were "non-exclusive".

But taking defendant's affidavit at face value it at best makes out a representation, but nowhere shows that plaintiff entered into a license agreement with defendant. Nothing is stated as to the duration of any such agreement or indeed as to any of its terms beyond the exclusivity feature. Whether or not plaintiff acquiesced in defendant's use of the service prior to August 18, 1978, plainly plaintiff has not done so since that date.

To raise an issue for a hearing defendant must set forth facts and may not rely on generalized and unsubstantiated yearnings. This is particularly so here where whatever oral representations were made by plaintiff to defendant are entirely within its own knowledge.

Defendant's attorneys state in a letter that the duration of the supposed oral license agreement may be inferred from the fact that "we are advised" that the contracts with building owners "were generally for a period of ten years" and that plaintiff allegedly encouraged defendant to enter into such contracts. Even assuming this, an agreement for a term beyond one year would not be enforceable under the Statute of Frauds unless in writing and signed by plaintiff. New York General Obligation Law § 5–701.

If defendant can establish at trial that as a result of plaintiff's asserted false representations defendant changed its position it may perhaps be entitled to money damages. But on the papers presented defendant has failed to show a consent by plaintiff to defendant's continued use of the program service.

Despite the clarity of plaintiff's rights under Section 605 and the avowed intention of defendant to continue as in the past, defendant contends that plaintiff has failed to establish the requisite degree of harm to entitle it to preliminary relief and that damages at the close of the case are an adequate remedy.

The judicial discussions in this circuit and elsewhere of the criteria for the issuance of a preliminary injunction have not always been consistent. But the proper objective of a court faced with an application for such relief seems clear. It is to try to keep to a minimum whatever irreparable loss of rights may be caused by a preliminary decision that is ultimately determined to be erroneous. Leubsdorf, *The Standard for Preliminary Injunctions,* 91 Harv.L.R. 525, 540–541 (1978).

Hesitancy in granting preliminary relief presupposes that there has been insufficient time or opportunity for the parties to present and the court to consider all the facts and legal principles pertinent to the merits of the request for a permanent injunction and that consequently there is some doubt in the court's mind as to whether the applicant will eventually succeed.

But where, as here, a defendant shows no justification for continuing to violate a plaintiff's clear statutory rights, there is no reason to withhold preliminary relief even without a showing of the same quantum of "irreparable" damage as would be required where plaintiff's ultimate success was more doubtful. Defendant has had every opportunity to advance whatever facts would support its contention that plaintiff orally consented to the use of the program service, and those facts must be within the knowledge of defendant. On the papers presented defendant has no right to intercept and use plaintiff's program service. If on all those papers plaintiff had moved for summary judgment for a permanent injunction, the court would have been obliged to grant the motion.

Defendant claims that it will be irreparably damaged by the issuance of a preliminary injunction because it will be put out of business. But in determining whether to grant relief the court may consider only

**530**

harm to defendant's legal rights. Any damages which the temporary injunction inflicts on defendant is occasioned not by the preliminary nature of the decision but by Section 605 of the Act. The only business of defendant which will be prohibited is the unauthorized use of something to which it has no fair claim.

Even if plaintiff were required to make a showing of irreparable injury in more traditional terms, it has done so. While the amount plaintiff is losing in fees can probably be estimated and awarded as damages, the injury to plaintiff's reputation and the interference with its business are not so readily repaired. Plaintiff plausibly claims that its present lack of control over the locations and customers being served by defendant and defendant's representation of the pirated service as its own are damaging plaintiff's name and jeopardizing its expansion plans. A judgment for damages is hardly adequate to compensate for these.

There is no merit to defendant's contention that plaintiff is too late in asking for preliminary relief. *Ives Laboratories, Inc. v. Darby Drug Co., Inc.,* 455 F.Supp. 939, 943 (E.D.N.Y.1978). Defendant, far from being prejudiced by the delay, has profited by it and continues to collect $75,000 a month from subscribers without making any payment to plaintiff.

The court's decision as to plaintiff's rights under Section 605 makes it unnecessary to consider the other grounds for relief advanced by plaintiff.

Conceivably defendant may be able to offer testimony at trial showing facts different from or in addition to those set forth in defendant's affidavit. Of course testimony relating to plaintiff's alleged violations of the Sherman Act would be irrelevant to whether an injunction should issue. *Bruce's Juices Inc. v. American Can Co.,* 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947); *Kelly v. Kosuga,* 358 U.S. 516, 79 S.Ct. 59, 3 L.Ed.2d 54 (1958). The remedies for any such violations are set forth in the antitrust laws and do not include allowing the continued appropriation of plaintiff's program service.

Pursuant to Rule 42(b) of the Federal Rules of Civil Procedure the court determines that in furtherance of convenience, expedition and economy a separate trial should be held on the issue of plaintiff's right to a permanent injunction. Such a trial shall commence at 11:30 A. M. on March 30, 1979.

Settle preliminary injunction order.

So ordered.