**UNITED STATES of America, Plaintiff,**

v.

**Philip G. WESTBROOK and Robert Moser, Defendants.**

**Crim. A. No. 80–80481.**

United States District Court,
E. D. Michigan, S. D.

Dec. 8, 1980.

---

Carl J. Marlinga, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Peter Moray, Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO DISMISS

PATRICIA J. BOYLE, District Judge.

The matter before the Court at this time is a motion, filed by both Defendants pursuant to Federal Rule of Criminal Procedure 12, to dismiss the information for failure to charge an offense.

Defendants Westbrook and Moser are charged in a three–count information with violating 47 U.S.C. §§ 302a and 605 and certain federal regulations related thereto. Section 605 prohibits the interception of interstate radio communications or the divulgence of the content of intercepted communications and the receipt of interstate radio communications to which the receiver is not entitled. Section 302a authorizes the Federal Communications Commission (FCC) to make regulations governing devices that emit radio waves sufficient to interfere with radio communication and prohibits the manufacture or sale of devices failing to comply with those FCC regulations. Section 501 of the same title provides the general penalty for violating these statutes, a maximum fine of Ten Thousand Dollars, one year imprisonment, or both. The information charges that Defendants conspired to intercept interstate radio communications and sold devices interfering with radio communications without conforming to applicable FCC regulations.

The communications in question are scrambled signals designed to be received by customers who pay a subscription fee in order to take advantage of what is popularly known as "subscription television" or "STV." STV is marketed in this area by a corporation known as National Subscription Television–Detroit, commonly referred to as "ON–TV." [1] Subscribers to ON–TV lease unscramblers, or decoders, in order to make the signals intelligible. Federal regulations provide that STV decoders be leased, not sold, and that they carry FCC approval prior to marketing. 47 C.F.R. §§ 73.-642, .644.

Defendants in this action allegedly sold and conspired to sell decoders capable of unscrambling the STV emissions without having gained prior FCC approval. The information sets out at some length those overt acts alleged to have been committed in furtherance of the conspiracy and, for the purposes of this motion, those allegations will be taken as true. *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1952).

The instant motion rests upon one central thesis, that the signal transmitted by ON–TV constitutes "broadcasting" within the meaning of 47 U.S.C. §§ 153($o$) and 605, and falls within that category of radio communications intended for general public use, not subject to the regulations and prohibitions applicable to point–to–point communications. In addition, Defendants argue that Section 302a and applicable regulations apply only to devices capable of emitting radiation and suggest that the decoders at

---

1. For a detailed description of typical STV operations, see *Home Box Office, Inc. v. Pay TV of Greater New York, Inc.,* 467 F.Supp. 525, 526–27 (E.D.N.Y.1979).

issue here do not emit radiation. They also contend that specific intent to violate federal regulations must be shown in order to prove a violation of 47 U.S.C. § 501, and that because Defendants did not have actual knowledge of the regulations, they could not have violated them with specific intent to do so.

Section 605 of Title 47 prohibits the interception or use of interstate radio communications by those not entitled to their benefits but provides that the section "shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is *broadcast or transmitted* . . . for the *use* of the general public. . . ." (Emphasis added.) The definition of "broadcasting" applicable to that section is found in 47 U.S.C. § 153(*o* ), which provides that the term "broadcasting" means "the dissemination of radio communications *intended to be received by the public*, directly or by the intermediary of relay stations." (Emphasis added.) Some prior cases construing Section 605 have focused on the word "broadcasting" while others have placed great emphasis upon the phrase "for the use of the general public." It is my conclusion that while the subscription television transmissions at issue here certainly constitute "broadcasting" within the term's definition in Section 153(*o* ), these transmissions are not "for the use of the general public" within the contemplation of the broadcasting exemption to Section 605. I therefore conclude that the information filed against Defendants does charge an offense under the laws of the United States.

In reaching this conclusion I rely upon several recent cases dealing with subscription television and similar forms of programming transmission. In the most recent of these, the Honorable Cornelia G. Kennedy of the Sixth Circuit Court of Appeals granted an injunction pending appeal against the same individuals who are defendants in the case at bar, finding that the plaintiffs in that action had shown a substantial likelihood of prevailing on the merits of their civil action. Judge Kennedy wrote: "Subscription television is not intended for the use of the general public; it is only intended for the use of the paying customers. Therefore it does not fall within the exception of § 605 and its communications are protected by that section." *Chartwell Communication Group v. Westbrook*, No. 80-1566 (6th Cir., August 15, 1980) (order granting injunction).[2]

Although it is true that subscription television often transmits programming of a type in which the public is interested, content alone does not render the transmissions within the exception of Section 605. I reach this conclusion despite a decision by the District of Columbia Court of Appeals that programming of interest to the general radio audience constitutes broadcasting. *See Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C.Cir.1958), *cert. denied*, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 81 (1959). *Functional Music* was a suit challenging FCC regulation of "functional radio programming" in which regular radio stations would broadcast music programming that included a supersonic tone emitted just before each commercial advertisement. Paying subscribers, most often offices, factories, and stores, would receive only the music, having deleted the commercials by means of special equipment furnished to subscribers by the service. The FCC objected to the broadcasting on the ground that radio broadcasters could not transmit both regular broadcasts and those for use of limited audiences. The District of Columbia Court of Appeals reversed the action of the FCC, holding that the agency could not properly regulate the transmissions, and indicated that

> [b]roadcasting remains broadcasting even though a segment of those capable of receiving the broadcast signal are equipped to delete a portion of that signal. . . . [F]unctional programming can be, and is, of interest to the *general* radio

audience.... In this light, a finding that the programming of petitioner and broadcasters comparably situated is not directed to, and intended to be received by, the public generally is clearly erroneous. Transmitted with the intent contemplated by § 3(*o*), such programming therefore has the requisite attributes of broadcasting.

274 F.2d at 548 (emphasis in original) (footnote omitted).

Comparison of the facts of *Functional Music* with those of the case at bar demonstrates however, that the court of appeals' holding is inapposite here. In the case of functional radio programming, members of the general public are able, by use of unaltered radio equipment, to *receive* the very same signals as do subscribers to the service; the special equipment merely deletes portions of those broadcasts. In the case of subscription television, however, the transmissions are unintelligible unless a special decoder is hooked up. Although the content of STV programming may be of interest to the general public, access to that programming cannot be gained with traditional television sets. Thus, although it may be said that the STV transmissions, like functional radio broadcasts, can be *received* by the general public (admittedly in scrambled form), the STV signals cannot be *used* by the public except by means of the special decoders.

The Court in *Home Box Office, Inc. v. Pay TV of Greater New York, Inc.*, 467 F.Supp. 525 (E.D.N.Y.1979), concluded, as I do, that subscription television does not fall within the exemption in Section 605 for broadcasting transmitted for the use of the general public. Noting that the signals are "not receivable by conventional television sets until ... modulated by special equipment," the court held that the subscription programs "are thus intended to be received not by 'the general public' but only by paying subscribers." *Id.* 528. The logic of this analysis incorporates the flexibility necessarily required of a statute designed to promote, protect, and regulate technological advances in radio communications. *See* *General Telephone Co. v. United States*, 449 F.2d 846, 853 (5th Cir. 1971).

The reasoning of the *Pay TV* decision recognizes the limited access intended by STV broadcasters and in my judgment is a more appropriate analytical approach than that which focuses on the wide appeal of STV broadcasting. In contrast to *Pay TV, Orth–O–Vision, Inc. v. Home Box Office*, 474 F.Supp. 672 (S.D.N.Y.1979), places great emphasis on the general audience appeal of programming known as "Home Box Office." The court framed the issue as whether the HBO programming is "intended to be received by the general public and, therefore, exempted from the protections of § 605," *Id.* 681, and held that such transmissions constitute "broadcasting" within the meaning of that section's proviso. Stating that "there is little to distinguish [HBO] transmissions from those of STV systems," the Court remarked that the HBO programming, "consisting of recent movies, sports events and variety shows, differs little from conventional broadcast fare and is obviously intended to appeal to a mass audience." *Id.* 682 (footnote omitted). I do not disagree that the programming of HBO and subscription television is designed to appeal to a public audience; the exemption for broadcasting, however, is for those transmissions broadcast "for the *use* of the general public." Because the *Orth–O–Vision* decision does not address this language of the statute, I find I must disagree with the holding in that opinion.

In a case involving radio transmissions not capable of being received by regular radios, a federal district court judge reached a conclusion equally applicable to the case at bar:

The nature of FM multiplex transmissions negates any intention that they be received by the public. Multiplex transmissions cannot be received on conventional FM sets, since they are disseminated not over the main broadcast channel but over a subcarrier frequency that can be received only with special equipment not part of the ordinary radio receiving set.

*KMLA Broadcasting Corp. v. Twentieth Century Cigarette Vendors Corp.,* 264 F.Supp. 35, 42 (C.D.Cal.1967).[3] This reasoning, together with the order by Judge Kennedy in *Chartwell Communications* and the holding of *Home Box Office v. Pay TV,* counsels that subscription television transmissions do not fall within the exemption of Section 605 for broadcasting for the use of the general public.

Defendants point to reports of the Federal Communications Commission, in which the FCC concludes that STV is broadcasting, and suggest that these reports require this Court to apply a similar interpretation to the penal statute. *See In re Amendment of Part 73 To Provide for Subscription Television Service,* 3 F.C.C.2d 1 (1966). In those proceedings, the FCC considered its own authority to promulgate and enforce regulations concerning subscription television transmissions, equipment, and programming. The Commission stated unequivocally that it considers STV to be broadcasting and that the fact that the transmissions are received by a limited number of persons who pay for the service "does not take the operation out of the definition of broadcasting." *Id.* 10. These FCC reports focused, however, on the authority of that agency to regulate STV and on whether such regulation ought to resemble regulation of point-to-point communications or that governing regular radio broadcasts. Thus, while the Commission may consider STV to be broadcasting for purposes of its own regulation of program content, such a ruling is not binding on an inquiry by this Court as to whether STV constitutes "broadcasting for the use of the general public," giving rise to criminal penalties for unauthorized use of the transmissions.

Defendants have pointed out that the instant case is the first criminal prosecution in the country for the unauthorized manufacture or sale of subscription television decoders. Prosecutions under Section 501 of the Communications Act have most often concerned wiretapping of telephones and other interceptions or unauthorized uses of what have traditionally been considered point-to-point communications. *See, e. g., United States v. Gris,* 247 F.2d 860 (2d Cir. 1957); *United States v. Turner,* 274 F.Supp. 412 (E.D.Tenn.1967). The technology of microwave transmissions used in subscription television, however, has converted what would otherwise be considered a "broadcast" medium into something far more like a point-to-point communications system. The ability of an STV transmitter to send scrambled signals that are not selectively *transmitted* but are selectively *received* brings the STV transmissions within the purpose of the statute and creates a circumstance in which the application of criminal sanctions is similarly appropriate.

■ In their brief in support of their motion to dismiss, Defendants imply that the decoder devices in question do not emit radiation and therefore are not governed by 47 U.S.C. § 302a as charged. Such a contention raises a question of fact and is not properly decided by this Court in a motion to dismiss.

■ Defendants also contend that they did not have "specific intent" to violate the regulations because they did not know of their promulgation and effect. While Defendants structure the issue as one of specific intent, it is apparent from the context of their argument that the claim refers to general *mens rea,* or a criminal state of mind. The United States Supreme Court has held that "[j]ust as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents." *Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 384–85, 68 S.Ct. 1, 3,

---

**3.** The Court notes that the oral arguments on the instant motion evidenced a factual dispute over whether the ON–TV transmissions at issue here actually involved subcarrier frequency transmissions. That remains a question of fact for further development and resolution at trial.

The existence of that dispute, however, does not render the logic of *KMLA Broadcasting* inapposite. The fact that the signals are scrambled and unintelligible without a decoder is not disputed.

92 L.Ed. 10 (1947). Defendants do not contend that the regulations were not published in the Federal Register, and the Government's brief indicates the dates of their publication. In light of this, Defendants cannot be heard to deny intent based upon actual notice of the regulations in question.

It is to be noted, however, that the briefs of the parties do not fully examine the degree of knowledge required for criminal liability under this statute. Whatever standard of *mens rea* is applicable for criminal violations of this statute, the Court cannot say at this early point that Defendants' conduct as alleged in the information, taken as true for the purposes of this motion, did not constitute illegal activity.

 During oral argument of this motion, Defendants suggested that the conduct alleged in the information here should not be subject to a criminal penalty for the reason that, although it may amount to interference with the business relations of subscription television broadcasters, it is not activity that ought to result in criminal fine or imprisonment. This Court, however, cannot construe the language of the statute in one fashion for civil actions and in another fashion for criminal prosecutions, and as the foregoing opinion indicates, I have concluded that Defendants' conduct violates the provisions of Section 605. This having been determined, the criminal liability of Defendants turns not on a different interpretation of the language of Section 605 for a criminal case but on the factual question of whether Defendants' acts were "wilful and knowing" as required by Section 501. The Court has already noted that the parties have not adequately explored what level of knowledge is required for a finding of "wilful and knowing" violation of the statute. I leave this question for future consideration, upon more exhaustive briefing by the parties.

For the above reasons, Defendants' Motion to Dismiss is hereby DENIED.

IT IS SO ORDERED.