**UNITED STATES of America**

v.

**Pete STONE, et al.**

**Crim. No. H–81–173–S.**

United States District Court,
S. D. Texas,
Houston Division.

Aug. 11, 1982.

Daniel T. Kamin, Asst. U.S. Atty., Houston, Tex., for plaintiff.

David Berg, Robert Bennett, George M. Secrest, Jr., Asst. Federal Public Defender, Houston, Tex., for defendants.

## ORDER

CARL O. BUE, Jr., District Judge.

Showbiz Entertainment Network (hereinafter SEN), is engaged in the business of marketing and transmitting a variety of television programs consisting of uncut motion pictures, sporting events, and other forms of entertainment generally unavailable on commercial television. SEN does not generally transmit its services directly to the ultimate consumers of the television programs; rather, the entertainment programming is sold and transmitted to distributors such as the Texas Entertainment Network (hereinafter TEN), who then sell the programming to consumers on a retail basis in exchange for a certain fee.

The entertainment programming provided by SEN to TEN is carried by microwave signal on Channel One of the multipoint distribution service (hereinafter MDS). This portion of the radio band, specifically, 2150–2162 megahertz, has been allocated by the Federal Communications Commission (hereinafter FCC) specifically for transmissions of this type. The microwave transmissions carrying this entertainment programming to paid subscribers of TEN are transmitted from a microwave transmitter licensed by the FCC and located in Greenway Plaza, Houston, Texas. The microwave transmitter is owned and operated by Taft Broadcasting.

The entertainment programming transmitted by microwave signal for the use of customers of TEN cannot be received by conventional television sets without supplemental equipment. In order to receive the microwave transmissions, microwave antennae and down converters are supplied by TEN to each of its paid subscribers.

Prior to the commencement of this cause, defendants Pete Stone, Rhea Hickmond Laws, Chris Walker, Scott Reynolds, Shayne Stone, Roger Chappel, Dalton Duclos, and Ted Connor were engaged in the business of advertising and selling microwave antennae, down converters, and components, that enabled purchasers to intercept MDS transmissions on conventional television sets.

On October 23, 1981, defendants Pete Stone, Laws, Walker, Reynolds, Shayne Stone, Chappel, Duclos, and Connor were charged by criminal indictment with twelve counts of mail fraud in violation of 18 U.S.C. § 1341 (Supp. 1982), and 18 U.S.C. § 2 (1969), and eight counts of copyright infringement in violation of 17 U.S.C. §§ 106(3), 506(a) (1977), and 18 U.S.C. § 2 (1969). The defendants were charged also with fifteen counts of the unauthorized interception and publication of radio communications in violation of 47 U.S.C. §§ 605 and 501 (1962 & Supp. 1982). In a superseding indictment filed on December 9, 1981, defendants Connor, Pete Stone, and Walker were charged with another count of having intercepted and divulged a radio communication without authorization in violation of 47 U.S.C. §§ 605 and 501 (1962 & Supp. 1982). Specifically, the Government alleges in Count 14 of the indictment that:

On or about the 3rd day of May, 1981 in the Houston Division of the Southern District of Texas and within the jurisdiction of this Court, the defendants, RHEA HICKMOND LAWS, ROGER CHAPPEL, PETE STONE, SCOTT REYNOLDS, and DALTON O. DUCLOS did knowingly and willfully and without authorization from the Texas Entertainment Network intercept and cause the unauthorized interception of private radio communications being transmitted on Channel One of the Multipoint Distribution Service (2150–2156 megahertz), to wit: the programming of the Showbiz Entertainment Network intended for the exclusive use of paid subscribers of the Texas Entertainment Network, and the defendants, RHEA HICKMOND LAWS, ROGER CHAPPEL, PETE STONE, SCOTT REYNOLDS, and DALTON O. DUCLOS did divulge and cause to be divulged to John McDaniel the contents and substance of the intercepted private radio communications, that contents and substance being the programming of the Showbiz Entertainment Network which was intended for the exclusive use of paid subscribers of the Texas Entertainment Network.

(Violation: Title 47, United States Code, Sections 605 and 501, Title 18, United States Code, Section 2 and Federal Communications Commission Rule 21.903).

The charges contained in count 14 are substantially similar to those charges contained in counts 15 to 27 and in count 36.

After the return of the indictment in the above-captioned cause, the defendants filed a motion to dismiss those counts in the indictment charging them with violations of sections 501 and 605 of Title 47 of the United States Code, contending that section 605 "cannot properly be applied to prohibit more [sic] receiving and showing of unscrambled, omnidirectional, radio transmissions." Specifically, defendants argued that

[s]uch an application has no support in the legislative history of the statute; receiving an omnidirectional radio communication is not the same as an 'interception', finally, such communications should be considered as being for the 'use of the general public' and thus exempt from the prohibitions of the law. Defendants will further show that the alleged divulging of the contents of the transmission is a form of speech protected by the First Amendment and that the government cannot show a compelling state interest, either in privacy or property rights,

which can justify this application of the statute to punish this speech.

Defendants' Brief in Support of Motion to Dismiss at 3. In a subsequent brief, defendants raised an additional ground in support of their motion to dismiss. Defendants contended that as there had never been a criminal case under § 605 directed at the conduct alleged to have been engaged in by the defendants in the indictment, it would be a violation of defendants' due process rights for this Court to construe that section 605 proscribes such conduct and then to apply this construction retroactively. In response to the defendants' motion, the Government filed a brief, to which the defendants responded thereto.

On March 22, 1982 the Court held a conference in chambers with counsel for all parties in attendance. The conference was held for the purpose of affording counsel an opportunity to present oral argument on the various pretrial motions, including defendants' motion to dismiss, which had been filed in the case. The first motion taken up for consideration was the defendants' motion to dismiss. Before argument on this motion commenced, the Court informed the parties that the strongest argument advanced by defendants in their motion and the argument with which the Court was concerned was the one involving due process. Counsel then reiterated their respective positions on the due process issue.

After careful consideration of the briefs on file and the arguments of counsel, the Court ruled orally that defendants' motion to dismiss was granted. The Court informed the parties at that time that to rule otherwise and to hold the defendants criminally liable under sections 605 and 501 of Title 47 would violate defendants' due process rights guaranteed by the Fifth Amendment of the United States Constitution. The Court informed the parties also that the Court would prepare a written order detailing its reasons for granting defendants' motion to dismiss. As stated by the Court in a subsequent Order, "[T]his seemed to be an appropriate course to follow, particularly when it was represented that the issue involved was one of first impression. What was extremely troublesome was the due process argument since it seemed that defendants were being criminally prosecuted for knowing and willful violations of law of which they could have no notice." At the March 22, 1982 conference, the Court also heard oral arguments on the other motions pending before the Court. After due consideration, the Court ruled orally on those other motions.

During the preparation of the Court's written order, the Court reviewed once again those portions of the briefs filed by both sides addressing the due process issue. In the course of its review, the Court examined the case of *United States v. Westbrook,* 502 F.Supp. 588 (E.D. Mich. 1980), a case which had been cited but not discussed or stressed in the Government's brief. It appeared to the Court at that time that the aforecited case was highly relevant to the critical issue. Rather than finalize its written order addressing the issues raised by the defendants' motion to dismiss, the Court directed the parties to submit additional briefs setting forth their respective positions on the effect of the aforecited case on the defendants' due process argument. After careful and judicious consideration of the briefs submitted by counsel in light of the relevant law, the Court rescinds its previous ruling with respect to the defendants' motion to dismiss, and instead denies defendants' motion to dismiss for the reasons set forth herein.

As stated earlier, the main thrust of defendants' due process argument is that as the conduct alleged in counts 13 to 27 and 36 as criminal is not specifically proscribed by 605 and as there has never been a criminal prosecution under section 605 directed at the acts alleged to have been committed by the defendants, a construction by this Court that such conduct is prohibited by section 605 and a retroactive application of such a construction would violate defendants' due process rights. In support of their position, defendants cite *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), and *Bouie v. City of*

*Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964).

■ The argument being advanced by defendants is predicated upon a legal principle similar to the principle contained in the *ex post facto* clause. The *ex post facto* clause of the United States Constitution, U.S. Const. art. 1, § 9, cl. 3, forbids Congress and the States from enacting statutes which impose or increase criminal punishment for acts committed prior to their enactment. *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981); *Harisiades v. Shaughnessy,* 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1951). "Through this prohibition, the Framers sought to assure that legislative acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham, supra,* 450 U.S. at 28–9, 101 S.Ct. at 963–964.

■ By its own terms, the *ex post facto* clause applies only to legislation. *Marks v. United States, supra,* 430 U.S. at 191, 97 S.Ct. at 992; *Frank v. Mangum,* 237 U.S. 309, 344, 35 S.Ct. 582, 593–594, 59 L.Ed. 969 (1915). Consequently, a judicial expansion of an existing criminal statute such as sections 605 and 501 of Title 47, already on the books at the time of the commission of the alleged criminal acts, cannot be a violation of the *ex post facto* clause. Nevertheless, it can be a violation of the due process clause of the Fifth Amendment of the Constitution of the United States. "The principle on which the [Ex Post Facto] Clause is based—the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties—is fundamental to our concept of constitutional liberty . . . [and] . . . that right is protected against judicial action by the Due Process Clause. . . ." *Marks v. United States, supra,* 430 U.S. at 191–92, 97 S.Ct. at 992–993; *Bouie v. City of Columbia, supra,* 378 U.S. at 350–55, 84 S.Ct. at 1700–1703; *Rabe v. Washington,* 405 U.S. 313, 315, 92 S.Ct. 993, 994, 31 L.Ed.2d 258 (1972) (per curiam); *Knutson v. Brewer,* 619 F.2d 747, 751 (8th Cir. 1980). *See also* L. Tribe, *American*

*Constitutional Law* § 10–2 (1978), W. La-Fave and A. Scott, *Criminal Law* § 12, at 94–97 (1972). However, as this Circuit has recognized recently: "[i]t is not every judicial expansion of statutory construction that creates an *ex post facto* law; rather, it is only those which are 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" *United States v. Martino,* 648 F.2d 367, 381 (5th Cir. 1981), *citing, Bouie v. City of Columbia, supra,* 378 U.S. at 354, 84 S.Ct. at 1702–1703.

In one of the briefs filed with the Court, the Government included a compilation of cases supporting the view that the interception and publication of microwave signals transmitted by a multipoint distribution service subjects a defendant to civil sanctions under section 605 of Title 47 of the United States Code. The defendants found fault with the use of these cases to counter their due process argument on the basis that these cases were from circuits other than the Fifth Circuit and imposed civil rather than criminal liability. Although defendants' assertion regarding the precedential value of cases from courts outside of this District and Circuit is meritless, defendants' argument addressing the value of such cases because they were civil rather than criminal in nature would warrant considerable attention if it were not for the decision in *Westbrook v. United States, supra.* In *Westbrook,* two defendants were engaged in the business of selling devices known as decoders which were capable of unscrambling subscription television transmissions. Subscription television is a service in which scrambled signals are transmitted to consumers who pay a subscription fee. Subsequently, the defendants were charged in a three count criminal information with violating sections 302a and 605 of Title 47, and various related regulations.

In a motion to dismiss filed after the institution of the charges against them, defendants attacked those parts of the criminal information alleging violations of section 605 by advancing the argument that subscription television signals constituted

broadcasting and fell within that category of communications intended for general public use. Relying upon several recent decisions dealing within subscription television and similar forms of programming transmissions, particularly a Sixth Circuit decision granting an injunction pending appeal in a civil case against the same defendants before the district court in *Westbrook, id.,* at 590, the Court held that the subscription television "transmissions are not 'for the use of the general public' within the contemplation of the broadcasting exception to section 605." *Id.* Accordingly, the Court concluded "that the information filed against defendants does charge an offense under the laws of the United States." *Id.*

Although the defendants in *Westbrook* did not raise the due process argument being advanced by defendants here, they did point out that their particular case was the first criminal prosecution in the country for the unauthorized manufacture or sale of subscription television decoders. In response thereto, the district court stated:

Prosecutions under Section 501 of the Communications Act have most often concerned wiretapping of telephones and other interceptions or unauthorized uses of what have traditionally been considered point-to-point communications. *See, e.g., United States v. Gris,* 247 F.2d 860 (2d Cir. 1957); *United States v. Turner,* 274 F.Supp. 412 (E.D. Tenn. 1967). The technology of microwave transmissions used in subscription television, however, has converted what would otherwise be considered a "broadcast" medium into something far more like a point-to-point communications system. The ability of an STV transmitter to send scrambled signals that are not selectively *transmitted* but are selectively *received* brings the STV transmissions within the purpose of the statute and creates a circumstance in which the application of criminal sanctions is similarly appropriate.

*Id.,* at 592. The defendants in that case argued also that the conduct alleged in the criminal information should not subject them to criminal penalty as such conduct was not of the type that ought to result in criminal fine or imprisonment. This assertion was ineffectual also.

This Court, however, cannot construe the language of the statute in one fashion for civil actions and in another fashion for criminal prosecutions, and as the foregoing opinion indicates, I have concluded that Defendants' conduct violates the provisions of Section 605. This having been determined, the criminal liability of Defendants turns not on a different interpretation of the language of Section 605 for a criminal case but on the factual question of whether Defendants' acts were 'willful and knowing' as required by Section 501.

*Id.,* at 593.

█ The decision in *Westbrook* imposing criminal liability under section 605 is fatal to the due process argument being raised in the case *sub judice.* Although *Westbrook* involved a form of radio communications different in degree from the MDS transmission involved here, the Court is of the opinion that the case accorded the defendants adequate notice that section 605 would support the imposition of criminal as well as the imposition of civil liability for the interception and the disclosure of MDS transmissions.

Because of the close relationship between subscription television and MDS transmissions, most importantly that both communications are transmitted not for the use of the general public but rather for the reception by customers who pay a fee, the Court considers defendants' attempt to distinguish the two forms of transmission to avoid the *Westbrook* decision to be unavailing. Contrary to defendants' arguments, for this Court to conclude that defendants can be prosecuted under 605 for the conduct alleged in the indictment in this case is not an unforeseeable judicial enlargement of sections 605 and 501. Instead, such a conclusion is a natural and foreseeable development of existing case law. Accordingly, the Court concludes that defendants' due process argument is meritless.

■■ With regard to the other grounds asserted by defendants as a basis for their motion to dismiss, the Court finds such grounds to be equally unavailing. There is ample support in case law and in the legislative history of the statute to support an application of section 605 to prohibit the interception and subsequent disclosure of transmissions of a MDS station. *See National Subscription Television v. S & H TV,* 644 F.2d 820 (9th Cir. 1981); *Chartwell Communications Group v. Westbrook,* 637 F.2d 459 (6th Cir. 1980); *American Television and Communications Corp. v. Western Techtronics, Inc.,* 529 F.Supp. 617 (D. Colo. 1982) (order granting preliminary injunction); *Home Box Office, Inc. v. Advanced Consumer Technology,* No. 81 Cn. 559 (ADS) (S.D.N.Y. Nov. 4, 1981); *American Home Theater, Inc. v. Aries Marketing, Inc.,* No. C–81–0675A (D. Utah Sept. 25, 1981); *American Television and Communications Corp. v. Pirate T.V. Inc.,* No. 81–969–Civ–EBD (S.D. Fla. Aug. 24, 1981) (order granting preliminary injunction); *American Television and Communication Corp. v. Pirate Inc.,* (D. Colo. July 24, 1981); *Louisville Subscription Television v. J & L Electronics, Inc.,* No. C. 81–0274 L (A) (W.D. Ky. May 27, 1981) (order granting preliminary injunction); *United States v. Westbrook, supra; Oak Industries, Inc. v. John and Jane Doe Sampson,* No. 80–420 PHX VAC (D. Ariz. July 10, 1980) (order granting preliminary injunction); *Home Box Office, Inc. v. Pay TV of Greater New York, Inc.,* 467 F.Supp. 525 (E.D.N.Y. 1979); *California Satellite Systems v. Ralph Nichols,* No. 294843, Dept. 21 (Cal. Super. Ct. May 1, 1981) (order granting preliminary injunction); Federal Communications Commission Public Notice No. 111580, Unauthorized Interception and Use of Multipoint Distribution Service (MDS) Transmissions (Jan. 24, 1979). Defendants' argument that MDS transmissions constitute broadcasting intended for the use of the general public is nugacious also. A number of well reasoned cases which the Court finds persuasive and will follow in the case *sub judice* have held to the contrary. *See National Subscription Television v. S & H TV, supra,* at 823–26; *Chartwell Communications Group v. Westbrook, supra,* at 465–66; *American Television and Communications Corp. v. Western Techtronics, Inc., supra,* at 620–21; *Home Box Office, Inc. v. Advanced Consumer Technology, supra,* at 16–28; *American Television and Communication Corp. v. Pirate Inc., supra,* at 5; *Louisville Subscription Television v. J & L Electronics, Inc., supra,* at 3–4; *United States v. Westbrook, supra,* at 590–92; *Home Box Office, Inc. v. Pay TV of Greater New York, supra,* at 528. *See also American Home Theater, Inc. v. Aries Marketing, Inc., supra; California Satellite Systems v. Ralph Nichols, supra,* at 5–7.

■■ Finally, the Court concludes that defendants' novel attempt to shield their conduct through the assertion of the First Amendment is without support of reason or case law. The communications defendants are alleged to have divulged did not originate with the defendants but were private communications among parties other than the defendants. These private communications were intercepted without authorization. In addition, the interception and divulgence of the private communications constituted conduct rather than speech, and as asserted by the Government, "[T]here has not been alleged any communicative element of [defendants'] conduct sufficient to even bring the First Amendment into play." *See United States v. O'Brien,* 391 U.S. 366, 376 (1968). ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.") Accordingly, for the reasons stated above, the Court denies defendants' motion to dismiss counts thirteen through twenty-seven and count thirty-six of the criminal indictment in this case.