AMERICAN TELEVISION AND COM-
MUNICATIONS CORPORATION, a
Delaware corporation, Plaintiff,

v.

WESTERN TECHTRONICS, INC., a
Colorado corporation;  et al.,
Defendants.

Civ. A. No. 81–C–1899.

United States District Court,
D. Colorado.

Jan. 15, 1982.

Patrick M. Westfeldt, Joseph W. Halpern,
Holland & Hart, Denver, Colo., for plaintiff.

Marshall Quiat, Quiat & O'Fallon, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

### CARRIGAN, District Judge.

Plaintiff American Television and Communications Corporation (hereafter, "ATC") brought this action seeking a permanent injunction and damages pursuant to the Communications Act of 1934, 47 U.S.C. § 605. Defendants are Western Techtronics, Inc., Philip E. Gallegos, Linda S. Gallegos, Mark S. Meisel, Curt H. Coolidge, Pat Driscoll, Pete Gallegos, Paul DeShayne, 777 Video Specialists, Inc., Wade Dale Finney, Kenneth Haack, Kelly Lynn Haack, Edward Stoker, Gene Schrader, John Schrader, Sheldon Sinclair, Jack Swallow, and Bill Carroll.

ATC is Home Box Office, Inc.'s (hereafter, "HBO") licensed distributor in the Denver, Colorado area. It charges its customers a monthly fee for receiving commercial-free movies and other features through special receiving equipment it furnishes. ATC claims that the defendants sell electronic equipment designed and adjusted especially to permit unauthorized persons to receive HBO programming without paying for it.

Defendants Meisel and Coolidge have consented to a permanent injunction against them, and ATC's damage claims against them have been dismissed. Of the remaining defendants, all but Pete Gallegos, Sheldon Sinclair and Jack Swallow have been served with process or have appeared through counsel. Subject matter jurisdiction is founded upon 28 U.S.C. § 1331.

A hearing on ATC's motion for preliminary injunction began December 15, 1981 and continued through December 18, 1981. Both sides appeared through counsel and presented evidence. The matter was taken under advisement. This memorandum opinion constitutes my findings of fact and conclusions of law as required by F.R.Civ. Proc. 52(a) and 65(d).

### I. General Background.

Most of the facts are undisputed. ATC is a Delaware corporation engaged in the business of marketing to paying subscribers HBO's commercial-free, television programs of uncut movies, sporting events, and other entertainment. ATC pays HBO a monthly fee for the right to distribute HBO programming as part of its pay-television service. HBO transmits its programming by common carrier microwave and satellite to ATC in Denver. ATC then transmits the programs by common carrier microwave to the top of Lookout Mountain, just west of Denver. From Lookout Mountain, the HBO programming is distributed to ATC's subscribers by another common carrier, Microvision.

Microvision is licensed by the Federal Communications Commission (hereafter, "FCC") to operate a Multipoint Distribution Service (hereafter, "MDS") in the Denver area.[1] Microvision's assigned MDS frequency is 2154 Megahertz. ATC pays Microvision a monthly fee for the use of its MDS system.

Since VHF and UHF tuners on standard television sets cannot receive MDS microwave transmissions, ATC provides each of its subscribers a special microwave antenna and a "down converter." The down converter "translates" the MDS signal into a frequency that a standard television set can display, usually an unused channel at the lower end of the VHF band. In the Denver area, VHF channel 3 is used. ATC's subscribers pay an equipment installation fee and a monthly subscription fee. ATC retains title to the antennae and down converters. It services and repairs this equipment at no additional charge to its subscribers.

ATC has invested very substantial sums to enable it to provide HBO service to its subscribers. Besides paying for antennae, down converters, programming license fees and common carrier fees, it employs personnel to install, service, repair and replace its equipment. It also advertises extensively to attract new subscribers.

---

1. The FCC's MDS technology regulations are found at 47 C.F.R. § 21.900 et seq.

ATC claims that the defendants advertise and sell microwave antennae, down converters, and components, with instructions for using these devices to receive ATC's MDS signals from the Lookout Mountain transmitter without paying subscription fees. Bluntly stated, ATC asserts that the defendants' sole purpose in selling this equipment is to enable their customers to intercept or "pirate" ATC's HBO programs without paying for them. ATC here seeks a preliminary injunction ordering the defendants to stop selling these devices until after the trial on the merits.

Defendants admit that the evidence shows that they advertise and sell this equipment, that their customers use the equipment to receive HBO signals from Lookout Mountain, and that they have told their customers that such reception is lawful. They deny, however, that ATC is entitled to a preliminary injunction. Defendants contend that: (1) MDS transmissions are intended for the general public's use, and thus may be freely intercepted; (2) ATC has no standing to bring this suit since ATC is merely HBO's licensee and since ATC's contract with Microband has expired; (3) ATC has not shown that the defendants' activities deprive ATC of customers; (4) ATC has an adequate remedy at law in damages, or can provide itself a remedy by "scrambling" its MDS signals; (5) no injunction can issue since ATC has not established the boundaries of its service area; and (6) any injunction would harm the defendants far more than the injury caused ATC by their conduct.

II. *Specific Findings and Conclusions.*

■ To obtain a preliminary injunction, ATC must establish: (1) there is a substantial likelihood that it will prevail on the merits; (2) it will suffer irreparable harm if the injunction does not issue; (3) the threatened harm to it outweighs any damage the proposed order may cause the op-

posing party; and (4) the order, if issued, would not be adverse to the public interest. *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir. 1980).

A. *Likelihood of Prevailing on the Merits.*

ATC founds its claims on 47 U.S.C. § 605, which provides in part:

" . . . . No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. . . . This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public, . . ."

Section 605 creates a private right of action. *Chartwell Communications Group v. Westbrook,* 637 F.2d 459, 466 (6th Cir. 1980). ATC contends that the defendants' actions in selling microwave antennae and down converters, together with oral instructions on using this equipment to tune in HBO programs, amounts to actively assisting their customers in unlawfully receiving HBO signals carrying programs to which those customers are not entitled. *See National Subscription Television v. S&H TV,* 644 F.2d 820, 826 (9th Cir. 1981). It is not disputed that ATC's HBO signals are "interstate communication" within § 605's meaning.

Defendant's argue that MDS transmissions are broadcast for use of the general public, and thus their conduct is not prohibited by § 605. ATC contends that MDS transmissions are private uses of a common carrier, not "broadcasting" as such, and therefore may not be intercepted by non-subscribers.[2]

---

**2.** This dispute centers on definitions fundamental to Congress' regulatory scheme for wire and radio communications. " 'Broadcasting' means the dissemination of radio communications *intended to be received by the public.* . . ." 47

U.S.C. § 153(*o*) (emphasis added). On the other hand, a "common carrier" is "any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmis-

Congress clearly intended, in enacting § 605 with its exception for broadcast signals, that certain transmissions could be limited only to designated receivers.[3] Congress gave the FCC power to classify frequencies on the electromagnetic spectrum, and assign them to stations, as part of the FCC's general responsibilities for wire and radio communications. 47 U.S.C. §§ 151, 303(a), (c). The FCC has exercised this power to designate frequencies for MDS use. See 27 C.F.R. § 21.901.

The FCC has also determined that MDS signals are "common carriage," not "broadcasting," and that unauthorized interception of MDS signals is prohibited by § 605. FCC, Public Notice No. 11850, "Unauthorized Interception and Use of Multipoint Distribution Service (MDS) Transmissions" (Jan. 24, 1979).

The courts that have considered § 605's application to MDS signals have split on the question. See Home Box Office, Inc. v. Pay TV of Greater New York, Inc., 467 F.Supp. 525, 528 (E.D.N.Y.1979) (unauthorized interception of MDS signals prohibited by § 605); accord, Home Box Office, Inc. v. Advanced Consumer Technology, Action No. 81 Civ. 559 (ADS) (S.D.N.Y. Nov. 4, 1981); contra, Orth-O-Vision, Inc. v. Home Box Office, 474 F.Supp. 672, 681–82 (S.D.N.Y.1979).

In holding that MDS signals are not protected by § 605, the Orth-O-Vision opinion relied in great part on an FCC suggestion that subscription television (hereafter, "STV")[4] is "broadcasting," and thus not protected from unauthorized interception. The FCC's STV suggestion and Orth-O-Vision's reasoning have been rejected, however, in two circuits. See National Subscription Television v. S&H TV, 644 F.2d 820, 825 (9th Cir. 1981); Chartwell Communications Group v. Westbrook, 637 F.2d 459, 465 (6th Cir. 1980). An FCC staff report has also criticized the earlier FCC suggestion. See FCC Office of Plans and Policy, "Policies for Regulation of Direct Broadcast Satellites," 124, n. 17, quoted in Chartwell, 637 F.2d at 465. As aptly stated in Chartwell,

"there is an important distinction between making a service available to the general public and intending a program for the use of the general public. The whole point of STV is to provide the service to as many members of the public as are interested. If the service could not be widely distributed there would be no business. However, the dual nature of STV is that while it may be available to the general public, it is intended for the exclusive use of paying subscribers. Availability and use are separate concepts. The subscription service in KMLA [Broadcast Corp. v. Twentieth Century Cig. Vend. Corp., 264 F.Supp. 35 (C.D.Cal. 1967)] was available to anyone who wanted it, but it was intended only for paying subscribers and was, therefore, not broadcasting (emphasis added)." Id.

■ This reasoning applies with equal force to MDS transmissions. For these reasons, I conclude that § 605 prohibits unauthorized interception of MDS signals.

Defendants also contend that ATC is not the proper party to bring this suit, for two reasons. First, they argue that HBO is the proper plaintiff since ATC only purchases the right to distribute HBO's programming in Denver. Second, they contend that ATC may not complain of any MDS signal "pirating" in Denver since ATC's contract with Microvision, the MDS common carrier, has expired.

■ These contentions are without merit. ATC holds the right to distribute HBO pro-

---

3. For a detailed history of Congress' communications legislation, see Home Box Office, Inc. v. sion of energy . . .; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier." 47 U.S.C. § 153(h) (emphasis added). Thus, "common carriers" and "broadcasters" are mutually exclusive categories.

Advanced Consumer Technology, Action No. 81 Civ. 559 (ADS) (S.D.N.Y. Nov. 4, 1981).

4. STV, unlike MDS, transmits a "scrambled" signal on an unused VHF or UHF frequency. Instead of an antenna and down converter, the subscriber is provided with a decoder. For § 605 purposes, STV and MDS are analytically indistinguishable.

gramming in the Denver area, and pays HBO for that right. This proprietary interest is sufficient to confer standing on ATC to object to the theft of HBO programming by microwave antennae pointed at its Lookout Mountain transmitter. Furthermore, there is evidence that ATC's contract with Microvision is still in force. Although the written instrument introduced as Plaintiff's Ex. 1 may have expired, ATC's HBO signals are still being distributed by Microvision from Lookout Mountain. This distribution sufficiently shows ATC's present involvement in MDS transmissions for purposes of its motion for preliminary injunction.

For these reasons, and because the evidence shows that the defendants have assisted unauthorized persons in intercepting MDS signals, I find that ATC has demonstrated a substantial likelihood of prevailing on the merits in this case.

### B. *Irreparable Harm.*

ATC has demonstrated that the nature of MDS receiving equipment, as well as the size of its Denver service area, make it impossible for it to take an accurate census of the unauthorized receivers. In addition, those persons intercepting MDS signals without paying for them are not likely to volunteer that they are doing so, since criminal penalties are provided for willfully violating § 605. *See* 47 U.S.C. § 501. For these reasons, compensatory damages attributable to loss of subscription fees cannot be accurately ascertained.

Defendants argue that ATC's remedy lies within its own power, since it could simply "scramble" its MDS signal and provide only its subscribers with decoders. "Scrambling" of MDS signals is authorized by 47 C.F.R. § 21.907(e).

The potential to "scramble" MDS signals, however, is no remedy, for two reasons. First, the evidence shows that such encoding and decoding would involve substantial additional expense for both ATC and its subscribers. Second, adding scramblers to ATC's system would only provide the defendants a new product market, since they could simply begin to sell decoders in addition to antennae and down converters.

"Scrambling" their MDS system would be a futile act.

For these reasons, I find that ATC has shown that it will suffer irreparable harm unless a preliminary injunction issues.

### C. *Balance of Equities.*

ATC has established that the defendants' illicit marketing of MDS receiving equipment significantly impairs ATC's exclusive right to distribute HBO programming in the Denver area. Obviously each equipment sale by the defendants eliminates a potential paying customer for ATC's service. Fixed overhead costs thus must be allocated to fewer subscribers. Thus the inescapable economic consequence of the defendants' activities is to keep the cost of receiving ATC's service higher for legitimate subscribers than it would be if some of the unauthorized receivers paid subscription fees.

Defendants argue that many of them depend on sales of these antennae and down converters for their livelihood, and thus any injunction would do them more harm than their activities cause to ATC, a thriving business worth millions of dollars. The uncontested evidence shows that some defendants do, in fact, depend on these sales for their livelihood. No one, however, has a vested right to earn a living by violating federal law. Defendants' conduct is prohibited by § 605, and it is no defense that some of them have chosen as a vocation a business that has turned out to be unlawful.

Therefore, I find that ATC has shown that the harm to it outweighs whatever damage a preliminary injunction may cause the defendants.

### D. *Public Interest.*

Congress has recognized and protected private communications in 47 U.S.C. §§ 153(h) and 605. It has also empowered the FCC to allocate frequencies. 47 U.S.C. § 303(a), (c). The FCC has seen fit to allocate certain frequencies to MDS use, and has declared that these frequencies are protected by § 605. *See* 47 C.F.R. § 21.900 *et seq.*; FCC, Public Notice No. 11850.

The result of this allocation and protection is that a subscriber-funded alternative

to broadcast television now exists. MDS's most obvious benefit is that MDS subscribers need not endure television commercials. Because of this, there is an undeniable public interest in the survival of MDS programming as an option to television which includes commercials. Defendants' conduct, in addition to being unlawful, hinders the development of MDS systems. By enticing consumers out of the class of legitimate subscribers, the defendants' conduct drives up MDS costs, or keeps them unnecessarily high. Reduction of MDS costs is essential to widen distribution of its programming. The public has an unquestionable interest in the widest possible distribution of this alternative television service.

For these reasons, I find that issuing the preliminary injunction requested here would not be adverse to the public interest.

### III. *Conclusion.*

■ Since ATC has established the four elements required by *Lundgrin v. Claytor*, 619 F.2d at 63, a preliminary injunction will issue against the defendants who have appeared so far in this action. My greatest difficulty has been finding any practical limit for the scope of this injunction. Since it is only temporary in nature, it should not be made broader than necessary to protect ATC pending trial on the merits. Defendants address this problem in their contention that ATC must establish its service area boundaries before an injunction may issue.

The nature of the MDS system, however, and the defendants' conduct in exploiting ATC's investment in that system requires a total ban against the defendants' unlawful activities. The evidence so far presented shows that the defendants have knowingly, intentionally and purposefully sold equipment to non-subscribers to assist them in pirating HBO programming. In the past, they have taken every opportunity to profit from ATC's efforts. If I attempt to limit the injunction to the geographic area presently served by ATC, the defendants probably will continue to sell their equipment and give out instructions on how to tune in the HBO signals from outside the designated

geographic area. As a practical matter, however, there will be no means short of criminal prosecution to prevent a buyer of such equipment from installing and using it within the area covered by the injunction. The clear intent of § 605 is to protect the plaintiff's business interest in its signal, wherever it may be received.

Accordingly,

IT IS ORDERED that the defendants Western Techtronics, Inc., Phil Gallegos, Linda S. Gallegos, Pat Driscoll, Paul DeShayne, 777 Video Specialists, Inc., Wade Dale Finney, Kenneth Haack, Kelly Lynn Haack, Edward Stoker, Gene Schrader, John Schrader, and Bill Carroll are hereby enjoined from selling any electronic device, components of any such device, or instructions for building any such device, which can be used to intercept the plaintiff American Television and Communication Corporation's programming. This injunction shall continue in force until trial on the merits of this dispute.

It is further ORDERED that the plaintiff American Television and Communication Corporation shall post bond in the amount of $20,000.00 for the protection of the enjoined defendants should they be found to have been wrongfully enjoined.