**NATIONAL FOOTBALL LEAGUE and Miami Dolphins, Ltd., Plaintiffs,**

v.

**The ALLEY, INC., American, Embassy, Inc., Frank and Helen DeCesare, d/b/a DeCesares Place For Ribs, Hernandez-McGeehan Corp., Hotel Properties, Ltd., Scotchel Enterprises, Inc., and Starship Odyssey, Inc., Defendants.**

No. 83–0701–CIV–JWK.

United States District Court,
S.D. Florida.

Dec. 29, 1983.

John Vanderstar, Margaret R. Alexander, Covington & Burling, Washington, D.C., for NFL.

Robert Shevin and Brian Dervishi, Sparber, Shevin, Rosen, Shapo & Heilbronner, Miami, Fla., for Miami Dolphins.

Richard G. Lubin, Lubin, Hamill & Gomberg P.A., West Palm Beach, Fla., for Scotchel Enterprises, Inc., American Embassy, Inc. and Hernandez-McGeehan Corp.

Goldberg Young & Borkson, Ft. Lauderdale, Fla., for Starship Odyssey, Inc.

## ORDER CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

KEHOE, District Judge.

This is a civil action in which plaintiffs, the National Football League and Miami Dolphins, Ltd., assert that certain local bar and restaurant owners violated federal and state rights by intercepting private satellite transmissions of football game telecasts and showing such programs in their bars. After a bench trial and consideration of all parties' oral and written submissions, the Court ruled for plaintiffs on the copyright issue and took the other claims under advisement. By the Declaratory Judgment and Injunction dated September 16, 1983, defendants were permanently enjoined from infringing plaintiffs' copyrights in NFL game programs.

On November 22, 1983, after further briefing, the Court ruled orally on the re-

maining claims under the Federal Communications Act and Florida state law, Counts III, IV and V of the Amended Complaint. Pursuant to Federal Rule of Civil Procedure 52(a), the following are the Court's findings of fact and conclusions of law with respect to Counts III, IV and V.

## FINDINGS OF FACT

*The Parties*

1. Plaintiff National Football League ("NFL") is an unincorporated nonprofit association constituted under the laws of New York. The NFL is composed of 28 member clubs that are engaged in the business of exhibiting professional football games. Through the NFL, the member clubs schedule games against one another and otherwise manage their affairs as a league.

2. Plaintiff Miami Dolphins, Ltd. ("Dolphins") is a Florida limited partnership located in Miami. It is in the business of exhibiting professional football games. It holds the NFL franchise in Miami and is a member club of the NFL. Its "home games" are played in the Orange Bowl in Miami, Florida.

3. Defendants Hernandez-McGeehan Corporation ("Hernandez"), American Embassy, Inc. ("American Embassy") and Scotchel Enterprises, Inc. ("Scotchel") are all Florida corporations that own and operate public restaurants and lounges located in Miami and West Palm Beach, Florida.[1]

*Plaintiffs' Interest in Game Telecasts*

4. On March 16, 1982, the Commissioner of the NFL, on behalf of the member clubs, entered into contracts with the three major networks, ABC, CBS and NBC, to provide for the telecasting of live television programs of NFL regular season and post-season games for five seasons commencing in the fall of 1982. By these contracts, each network obtained exclusive rights to televise certain NFL games, subject to contractual limitations, among them the requirements that unsoldout games not be broadcast live—*i.e.*, that they be "blacked out"—in the home club's "home territory," which means the area within a 75-mile radius of the club's home city, and that all of a club's "away" games be broadcast live back to the home city.

5. These exclusive contracts with their limitations on broadcast rights serve plaintiffs' economic interest in controlling the distribution of the sports entertainment product that the clubs create. The contract limitations also foster development of a local following for individual clubs.

6. In accordance with the contracts, the networks telecast live the Dolphins home games of December 5, 18 and 27, 1982 and January 8, 16 and 23, 1982. The live telecasts of December 5, 18 and 27, 1982, and January 8, 1983, were "blacked out" in the Dolphins home territory and thus were unavailable for viewing by the general public on any television station broadcasting in south Florida. The live telecasts of the games played on January 16 and 23, 1983, were not "blacked out."

*The Telecasting Process*

7. Each of the Dolphins home game programs was created in a network mobile unit near the Orange Bowl, and transmitted by satellite and telephone line to network studios in New York. At the studios, nationwide commercials, promotional announcements and sports news updates were added and the signal was then instantaneously transmitted to certain network affiliated television broadcast stations by means of telephone lines and microwave transmission, or, on occasion, by satellite. Local broadcast stations then inserted their own commercials and other material, and broadcast over the air.

8. Until all of the national and local commercials, commentary and station identification materials were added, the trans-

---

[1] The other defendants named in the complaint, The Alley, Inc., Hotel Properties, Inc., Frank and Helen DeCesare d/b/a/ DeCesare's Place for Ribs and Starship Odyssey, Inc., settled prior to trial. The complaint against The Alley, Inc. was voluntarily dismissed. Consent judgments have been entered against the other defendants.

missions were not complete for broadcast purposes.

9. The satellite signals capable of being intercepted were transmitted in the so-called "C band" frequencies, 3700 to 4200 megahertz.

10. Expert testimony established that it is not possible to receive "C band" transmissions with ordinary home television equipment. Instead, special earth stations—or "dish antennas"—are required. This Court has already held that such antennas are not commonly used in private homes. Declaratory Judgment and Injunction, ¶ 5.

*Defendants' Activities*

11. Defendants have motorized receive-only earth stations ("dish antennas") approximately 13 feet in diameter installed on their business premises, together with satellite receivers and other auxiliary equipment. By means of these devices, satellite signals are received and converted to a frequency that can be displayed on the multiple television sets and viewing screens in Bogie's Lounge, American Embassy Lounge and the Yorkshire Inn.

12. Defendants' dish antennas and their auxillary equipment were purchased and installed at a cost of approximately $6,000–6,500 for each system.

13. By using the dish antenna, each defendant obtained satellite signals embodying some or all the "blacked out" Dolphins home game programs of December 5, 18 and 27, 1982, and January 8, 1983, and at least one of the "non-blacked out" Dolphins homegames of January 16 and 23, 1983.

14. All defendants made the live programs available to patrons at their bars on multiple television sets and viewing screens. Such patrons purchased meals and/or drinks while viewing the programs. On occasion defendant Scotchel charged admission or solicited donations from patrons wishing to view the intercepted programs.

15. At no time have plaintiffs or any of the three telecasting networks authorized defendants' reception or public showing of the satellite feeds carrying Dolphins home game programs.

16. The NFL and Dolphins have sustained, and will continue to sustain, irreparable injury due to defendants' activities. The defendants have testified that they will continue to engage in activities complained of unless enjoined by this Court.

*Players' Interest in Game Telecasts*

17. Dolphins team members have consented to the use of their names and likenesses in game telecasts by participation in televised games and by entering into player contracts granting plaintiffs the right to so use their names and likenesses.

18. Defendants' use of such names and likenesses by public showings of intercepted telecasts, while it conferred commercial advantages, was not a trade or advertising use that directly promoted defendants' bar/restaurant services or any product.

19. Defendants' customers were attracted to defendants' establishments by the football game telecasts which were of current legitimate public interest.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the Communications Act claim under 28 U.S.C. § 1331, and pendent jurisdiction of the state law claims which share with the federal issues a common nuncleus of operative fact. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

*Federal Communications Act*

2. Satellite transmissions of NFL game programs are radio communications within the meaning of Section 605 of the Federal Communications Act of 1934 *as amended,* 47 U.S.C. § 605. *See In the Matter of Regulation of Domestic Receive-Only Satellite Earth Stations,* 74 F.C.C.2d 205, 216 (1979).

3. Plaintiffs have demonstrated important economic and professional interests in the integrity of the communications system that distributes their entertainment product. Such interests are within the pro-

tective sphere of Section 605. Indeed, plaintiffs concerns are not logically distinguishable from those of the transmitting networks. The Court therefore concludes that the NFL and Dolphins have standing to bring this private action for violation of their statutory rights. Cf. *American Television and Communications Corp. v. Western Techtronics, Inc.*, 529 F.Supp. 617 (D.Col.1982).

■ 4. The satellite transmissions at issue are not deprived of protection by Section 605's proviso exempting interception of "any radio communication which is broadcast or transmitted ... for the use of the general public." First, the Federal Communications Commission restricts use of the C band frequencies to "point-to-point" communications, *not* broadcasts. *See Regulation of Receive-Only Earth Stations*, *supra*, 74 F.C.C.2d at 216; 47 C.F.R. § 2.106. Second, the necessity of special and expensive receiving equipment not in common household use demonstrates that the satellite transmissions cannot have been intended for use by the general public.

5. Each defendant's activities violated the express language of Section 605. The interceptions of protected satellite communications were unauthorized. The communications' comments were "divulged" to the paying public present at defendants' lounges. The defendants thereby used, "for their own benefit," intercepted communcations to which they were not entitled.

■ 6. Plaintiffs have demonstrated irrepable injury to which there is no adequate remedy at law. Moreover, defendants' unlawful practices are inimical to the public interest embodied in Section 605. Injunctive relief is therefore appropriate.

*Florida's Statutory "Right of Publicity"*

■ 7. Section 540.08 of the Florida Statutes prohibit unconsented use of an individual's name and likeness only when such directly promotes a commercial product or service. *Loft v. Fuller*, 408 So.2d 619 (Fla. 4th D.C.A., 1981). Because de-

fendants did not so use Dolphins players' appearances in the intercepted transmissions, such use did not violate Section 540.08.

8. Moreover, Section 540.08 exempts from its prohibition unconsented use of names or likenesses as part of a "presentation having a current or legitimate public interest." Defendants' use of the intercepted telecast falls within this statutory exemption.

■ 9. Even if a prohibited use had occurred, the players' contractual consent to appear in game telecasts constituted waiver of their rights under the Florida statute.

*Common Law "Right of Publicity"*

■ 10. Assuming, without holding, that Florida's common law recognizes a right of publicity, the right is a personal one and may not be assigned to another entity. Consequently, these plaintiffs lack standing to bring a common law action on behalf of individual players.

■ 11. Even if plaintiffs could properly assert players' rights, defendants' use of players' professional personalities has not been shown to be an advertising use such as would offend those rights. Whatever commercial benefit defendants derived, it was not sufficient to recover under the common law doctrine.

## CONCLUSION

12. Final Judgment on the remaining counts of the amended complaint will be entered by separate order pursuant to these findings of fact and conclusions of law.

## FINAL JUDGMENT AND INJUNCTION

THIS ACTION came on for final hearing before the Court, the undersigned judge presiding, and a decision having been duly rendered by the Court's Findings of Fact and Conclusions of Law, it is therefore

ORDERED AND ADJUDGED as follows:

(a) Defendants' interception, divulgance and use of private satellite communications for their own benefit by public showings in

their places of business violated plaintiffs' rights under Section 605 of the Federal Communications Act of 1934, *as amended.*

(b) Defendants American Embassy, Inc., Hernandez-McGeehan Corporation and Scotchel Enterprises, Inc., their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are hereby permanently enjoined from intercepting satellite transmissions of live NFL football game programs by means of satellite earth stations and divulging or publishing the existence, contents, substance, purport, effect or meaning of such transmissions, or using such transmissions for their own benefit or the benefit of anyone else not entitled thereto, without the prior written consent of the National Football League and participating home clubs.

(c) Count IV of the Amended Complaint is hereby dismissed with prejudice.

(d) Count V of the Amended Complaint is hereby dismissed with prejudice.