**ENTERTAINMENT AND SPORTS PROGRAMMING NETWORK, INC.,** Heritage Cablevision of Texas, Inc., Home Box Office, Inc., and Southern Satellite Systems, Inc., Plaintiffs,

v.

**EDINBURG COMMUNITY HOTEL, INC., d/b/a Echo Motor Hotel,** Defendant.

Civ. A. No. B–84–448.

United States District Court, S.D. Texas, Brownsville Division.

Feb. 15, 1985.*

---

* Publishers note: an amendment to this opinion will be subsequently published.

Koppell Ezell Jackson, James S. Bates, P.C. & Powers by Michael R. Ezell, Harlingen, Tex., Frates Bienstock & Sheehe by Terry S. Bienstock, H. Mark Vieth, Miami, Fla., for plaintiffs.

Glaser Griggs & Schwartz by Richard L. Schwartz, Dallas, Tex., and James S. Bates, P.C., by James S. Bates, Edinburg, Tex., for defendant.

### FINAL JUDGMENT FOR PERMANENT INJUNCTION AND DAMAGES

VELA, District Judge.

This matter came before this Court on January 25, 1985 on Plaintiffs' Motion for Preliminary Injunction. The Court has consolidated this hearing with the trial of the action on the merits pursuant to Rule 65(a)(2), Federal Rules of Civil Procedure.

Plaintiffs seek to enjoin the Defendant from unauthorized and willful interception, reception, exhibition and public performance of copyrighted and otherwise protected satellite-delivered audiovisual programming through the use of a satellite reception dish antenna at Defendant's motor hotel, and a judgment for damages, attorneys' fees and costs. The bases for relief are the Federal Communications Act of 1934, 47 U.S.C. § 605 [*as amended* 705(a)]; the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.;* the Lanham Act, 15 U.S.C. §§ 1051–1125; federal common law, and Texas statutory and common law.

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1338 over the federal claims, and pendent jurisdiction of the state law claims.

The issues raised have been briefed and this Court has reviewed evidence and heard argument of counsel. The parties have stipulated to the operative facts in this action and have agreed to entry of this

order and judgment. Upon this, the Court concludes that plaintiffs are entitled to permanent injunctive relief, damages and attorneys' fees and costs, and hereby makes and enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiff, HERITAGE CABLEVISION OF TEXAS, INC., ("HERITAGE"), owns and operates cable television systems and is engaged in the business of acquiring exhibition and performance rights to programming, some of which is copyrighted, for distribution to its cable television systems, subscribers and authorized satellite antenna users. HERITAGE pays the originators of the programming for such exhibition and performance rights. HERITAGE is an authorized distributor of such television programming to customers through its local cable television systems in its franchised service areas, including Cameron, Willacy and Hidalgo Counties, Texas, and incorporated municipalities therein.

2. Plaintiff, ENTERTAINMENT AND SPORTS PROGRAMMING NETWORK, INC., ("ESPN"), produces a private, pay television entertainment service consisting primarily of sports programming, featuring amateur and professional events. Plaintiff, HOME BOX OFFICE, INC., ("HBO"), produces private, commercial-free pay television entertainment services called "Home Box Office" and "Cinemax", consisting of movies, special events and sports programming, some of which, as with ESPN, it copyrights under the Copyright Law of the United States, 17 U.S.C. § 101 *et seq.*

3. ESPN and HBO acquire distribution and public display rights for motion pictures, sports events, and other audiovisual works from authors, producers, event organizers, or distributors, and distribute such assembled works in entertainment programming services. Each programming service distributes its programming to operators by transmitting its signals to a satellite. HBO and ESPN contract with subscription television operators to distribute their programming by means of either cable television, direct satellite reception, or microwave distribution service. Subscription television operators, including HERITAGE, pay a per customer subscription fee for the right to include the services in their cable transmissions. The operators receive the signal by means of satellite antennas or "earth stations".

4. HBO has registered its trademarks and trade names in order to identify and distinguish its products from those of its competitors. ESPN is in the process of registering its trademark and trade name.

5. Plaintiff, SOUTHERN SATELLITE SYSTEMS, INC., ("SSS"), is an FCC-licensed resale common carrier which sells the signal of WTBS, a television broadcast station in Atlanta, Georgia, consisting of full-time sports, movies, variety and news. SSS contracts with local cable operators, including HERITAGE, which pay a fee for the right to receive the signal of WTBS via a satellite channel of communication.

6. Defendant, EDINBURG COMMUNITY HOTEL, INC., d/b/a ECHO MOTOR HOTEL, owns and operates the Echo Motor Hotel in Edinburg, Texas, which is within the franchised service area of HERITAGE. Defendant, in fact, had been a subscriber of HERITAGE, but discontinued the cable service and replaced it with reception by use of a satellite earth station.

7. HERITAGE transmits programming services acquired through coaxial cable to subscribers. HERITAGE is also an authorized distributor of services received directly by satellite antennas. As a cable system operator, HERITAGE provides a basic cable service to subscribers for a monthly fee. This basic cable service includes local broadcast channels, imported signals (distantly broadcasted television channels), and other satellite-delivered programming services, including ESPN and WTBS. Additionally, HERITAGE provides certain premium programming, including HBO and Cinemax, for which subscribers pay a fee in addition to their basic cable fee. HERITAGE pays copyright fees to the Copyright Royalty Tribunal and licensing fees to the program suppliers.

8. Through various contractual agreements, HERITAGE has acquired the right to exhibit, perform and retransmit programming services to its customers. HERITAGE has master contracts with program suppliers authorizing the distribution of programming throughout HERITAGE's cable systems, although not all are currently being distributed by HERITAGE in south Texas. HERITAGE's master contracts authorize it to distribute HBO, Cinemax, Galavision, ESPN, WTBS, Showtime, The Movie Channel, WGN, Playboy Channel, Cable News Network-Headline News, Reuters Ltd., Disney Channel, The Music Channel, CNN, Arts and Entertainment, Nickelodeon, U.S.A. Network, Nashville Network, The Weather Channel, MTV, Lifetime, CBN, and SIN.

9. The monthly charge paid by HERITAGE's customers for the basic and premium programming is the primary source of revenue for HERITAGE's cable systems. The fees paid by subscription television service operators, including HERITAGE, are the primary source of revenue for the entertainment programming service companies.

10. The programming service companies and HERITAGE, through its cable systems, provide their customers with services different from those provided by "free" standard broadcast television. The signals transmitted via satellite to HERITAGE, other cable system operators, and other fee-paying distributors are intended for use only by such companies' paying customers, and are not transmitted for the benefit of or use by the general public.

11. Defendant has been and is engaged in the distribution of Plaintiffs' programming, and has intercepted, received, exhibited, publicly performed and retransmitted for profit the audiovisual works of Plaintiffs through the use of a satellite dish antenna and related equipment installed on its premises.

12. Defendant's interception, reception, exhibition, public performance and retransmission of the audiovisual works are made without the consent or license of the programming service companies, copyright owners, common carriers, or HERITAGE, an authorized distributor of such programming in the franchise area. No part of the proceeds received from Defendant's patrons for viewing of the audiovisual works has been paid to any of the Plaintiffs.

13. Defendant's acts are willful because its purpose and intent in receiving and exhibiting such audiovisual works is to profit by misappropriating the Plaintiffs' rights to the programming and transmissions, while avoiding payment therefor. Furthermore, Defendant had been advised by the programming service companies that its activities are unauthorized and that it should immediately cease and desist. Defendant did not do so until after suit was filed, and then it received other satellite-delivered programming services for which HERITAGE has master contracts.

## CONCLUSIONS OF LAW

### SECTIONS 605 AND 705(a) OF THE FEDERAL COMMUNICATIONS ACT

1. Section 605 of the Federal Communications Act of 1934, 47 U.S.C. § 605, which has been amended and redesignated as 47 U.S.C. § 605(a) (effective December 29, 1984), prohibits any person from receiving or assisting another in receiving any non-public radio communication for his own benefit or for the benefit of another not entitled thereto.

2. The satellite transmissions embodying the audiovisual works of the Plaintiffs are protected communications under 47 U.S.C. §§ 605 and 705(a), because they are intended to be used only by those who use special reception equipment, and who are authorized and pay a subscription fee.

3. By virtue of their respective positions as purchasers and distributors of the audiovisual works, or as senders of private interstate communications, Plaintiffs have important economic interests in the integrity of the communications system by which they distribute the audiovisual works, *i.e.,* the reception of such communications only

by those persons who obtain appropriate authorization and pay the requisite fees.

4. First, it must be determined whether the Plaintiffs have standing to assert claims under 47 U.S.C. §§ 605 and 705(a). As senders of the subject satellite communications, HBO, ESPN and SSS are intended beneficiaries of the protections of the statute, and clearly have standing to protect their transmissions. *Rainbow Programming Services Co. v. Patel*, Case No. PCA 82–6009 (N.D.Fla.1982); *Home Box Office, Inc. v. Advanced Consumer Technology*, 549 F.Supp. 14 (S.D.N.Y.1981). Because the programming suppliers did not authorize Defendant to receive their transmissions, they have suffered injury in fact under the Communications Act.

5. HERITAGE, as an intended, authorized receiver of the subject programming, likewise has suffered injury in fact from Defendant's violation of 47 U.S.C. §§ 605 and 705(a). HERITAGE has entered into master contracts with program suppliers for the purpose of distributing such programming through its cable systems. Because of its contractual rights to distribute the programming, HERITAGE has demonstrated important economic interests in protecting the integrity of the communications system which distributes the programming. *National Football League & Miami Dolphins, Ltd. v. The Alley, Inc.*, Case No. 83–0701–CIV–JWK (S.D.Fla.1983); *American Television & Communications Corp. v. Western Techtronics, Inc.*, 529 F.Supp. 617 (D.Colo.1982). The right to distribute programming and the payment for this right is sufficient to confer standing on HERITAGE. *American Television & Communications Corp. v. Western Techtronics, Inc., supra.* Thus, HERITAGE is a proper party to assert its right to prevent unauthorized reception of programming in which it has a proprietary interest and either currently provides or could distribute in the future. The legislative history of § 705 supports such standing. 1984 *U.S. Code Cong. & Ad.News* 4750.

6. Defendant's conduct constitutes at least five different violations of Sections 605 and 705(a). First, the Defendant's overall scheme of unauthorized interception of satellite transmissions and retransmission of such communications into guest rooms violates the first part of Sections 605 and 705(a) in that Defendant is "receiving ... (and) transmitting ... (a) communication ... (and) divulg(ing) or publish(ing) the ... contents ... through (un)authorized channels of transmission or reception." Second, because neither HERITAGE, HBO, ESPN, nor SSS has authorized the Defendant to receive any satellite transmissions, Defendant violates the second part of Sections 605 and 705(a) in that it is not "authorized by the sender (to) intercept," and yet it "divulge[s] or publish[es] the ... contents ... of such intercepted communication" to its guests. Third, throughout the installation, testing, and continued use of an earth station to receive satellite transmissions for hotel and motel guests without authorization, Defendant has engaged in a pattern of activity amounting to reception and use of satellite transmissions "for [its] own benefit or for the benefit of another not entitled thereto." Fourth, Defendant's retransmission of the intercepted satellite communications to its guests violates Sections 605 and 705(a) in that it "divulge[s] or publish[es] the ... contents ... of such (intercepted) communication." Finally, Defendant, by permitting its guests to view the programming, "assists (its guests) in receiving" communications to which they are not entitled.

7. Courts which have been presented with claims on behalf of program originators under 47 U.S.C. § 605 have enjoined the unauthorized interception of satellite communications. *Pro Am Sports System, Inc. v. Larry Simone, Inc.*, 738 F.2d 440 (6th Cir.1984); *National Football League & St. Louis Cardinals, Inc. v. Cousin Hugo's, Inc.*, 600 F.Supp. 84 (E.D.Mo.1984) (Order and Preliminary Injunction); *National Football League & Miami Dolphins, Ltd. v. The Alley, Inc., et al.*, 624 F.Supp. 6 (S.D.Fla.1983) (Memorandum Decision); *Rainbow Programming Servs. Co. v. Patel*, Case No. PCA 82–6009, (N.D.

Fla. Jan. 18, 1982) (Memorandum Decision). In each case, the defendants intercepted satellite transmissions without the authorization or permission of the program originators or licensed distributors. In each case, the court held that the satellite transmissions did not fall within the exception of § 605 which permitted reception of transmissions for the "use of the general public." The Court is not aware of any cases in the United States to the contrary.

8. The position of the Federal Communications Commission (FCC) is equally clear. In a public notice sent to earth station licensees, the FCC warned that some licensees of earth station facilities were unlawfully receiving and distributing satellite transmissions without authorization from the sender. F.C.C. Public Notice, *Unauthorized Interception and Use of Satellite Transmission*, October 3, 1978. *See Regulation of Domestic Receive— Only Satellite Earth Stations*, 74 F.C.C.2d 205 (1979). Finally, Congress has approved and incorporated into § 705(a) the decisional law interpreting § 605. *See* 130 *Cong. Rec.* H. 10439 (daily ed. October 1, 1984).

9. Moreover, courts that have examined other methods of unauthorized interception of subscription television transmissions have uniformly held that the sale or use of devices designed to intercept and receive over-the-air subscription television signals violates § 605. *Movie Systems, Inc. v. Heller*, 710 F.2d 492 (8th Cir.1983); *National Subscription Television v. S & H TV*, 644 F.2d 820 (9th Cir.1981); *Chartwell Communications Group v. Westbrook*, 637 F.2d 459 (6th Cir.1980); *American Television and Communications Corp. v. Pirate T.V.*, Case No. 81–969–Civ–EBD (S.D.Fla.1983) (August 21, 1981 Order Granting Preliminary Injunction; May 19, 1983 Order Granting Summary Judgment on Liability and Entry of Permanent Injunction); *United States v. Stone*, 546 F.Supp. 234 (S.D.Tex.1982); *American Television and Communications Corp. v. Western Techtronics*, 529 F.Supp. 617 (D.Colo.1982); *Home Box Office, Inc. v. Advanced Consumer Technology*, 549 F.Supp. 14 (S.D.N.Y.1981); *United States v. Westbrook*, 502 F.Supp. 588 (E.D.Mich. 1980); *Home Box Office, Inc. v. Pay TV of Greater New York, Inc.*, 467 F.Supp. 525 (E.D.N.Y.1979).

10. This action does not fall within the exception to liability provided by 47 U.S.C. § 705(b) for private home viewing by an individual of satellite cable programming. The interception and receipt of satellite cable programming by a hotel and the retransmission of such programming to its hotel guests is not "private viewing" as defined 47 U.S.C. § 705(c)(4). Subsection (c)(4) defines private viewing as "viewing for private use in an individual's dwelling unit by means of equipment, owned or operated by such individual." The equipment used by defendant is neither owned nor operated by the individuals receiving the programming, nor is the programming received in the individual's dwelling. To the contrary, the equipment was operated by the hotel for financial gain and commercial advantage.

11. As a direct and proximate result of Defendant's acts, Plaintiffs have lost the revenue to be derived from the delivery and the exhibition of the programming to Defendant's numerous hotel patrons, causing substantial and irreparable harm, including but not limited to, a loss of revenue and profits, damage to their goodwill and reputation, and loss of their right and ability to control and receive fees for the reception of their communications. Defendant's conduct was, and is, willful and for the purpose of direct or indirect commercial advantage and for private and financial gain.

### SECTIONS 106 AND 111(b) OF THE COPYRIGHT ACT

12. 17 U.S.C. § 106(4) and (5) provide that the owner of a copyright has the exclusive right to authorize the public performance and display of its copyrighted works. 17 U.S.C. § 101 defines "public performance" as the performance or display of a work to a substantial number of persons outside a normal circle of family or friends. A public performance also occurs

when a work is transmitted with any device to the public for reception in separate places. The House Report on the Copyright Act makes explicit that performances to occupants of hotel rooms fall within the definition of a public performance. H.R. Rep. No. 94–1476, 94th Cong. 2d Sess. 64–65 (1976) U.S.Code Cong. & Admin.News 1976, pp. 5659, 5677, 5678.

13. Additionally, 17 U.S.C. § 111(b) provides that the secondary transmission to the public of a primary transmission is actionable as an act of infringement under Section 501 of the Act if the primary transmission is not made for reception by the public at large. The House Report on the Copyright Act of 1976 clearly contemplates that the secondary transmission of private copyrighted programming constitutes an infringement. According to the House Report:

> [t]he secondary transmission to the public of the primary transmission embodying a performance or display is actionable as an act of infringement if the primary transmission is not made for reception by the public at large but is controlled and limited to reception by particular members of the public. Examples of transmissions not intended for the general public are background music services such as MUZAK, closed circuit broadcasts to theatres, pay television (STV) or pay cable.

H.R.Rep. No. 94–1476, 94th Cong. 2d Sess. 92 (1976), U.S.Code Cong. & Admin.News 1976, p. 5706.

14. 17 U.S.C. § 501(a) declares that "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 ... is an infringer of the copyright."

15. Defendant, by means of its earth station, has for over two years intercepted the transmissions of HBO's and ESPN's copyrighted programming and has publicly performed and displayed such intercepted copyrighted motion pictures and other programming by showing it to patrons of its hotel. This conduct is without the authority or permission of ESPN or HBO, and violates their exclusive rights. Each performance transmitted at any one time by Defendant of Plaintiffs' copyrighted programming is a separate infringement under the copyright law.

16. All courts that have addressed the issue agree. In *National Football League & St. Louis Football Cardinals, Inc. v. Cousin Hugo's Inc.*, 600 F.Supp. 84 (E.D. Mo.1984) (Order and Preliminary Injunction); *National Football League & Buffalo Bills v. Big Play Restaurant*, Civil Action No. 82–1293E (S.D.N.Y. Nov. 18, 1983) (Order of Preliminary Injunction), and in *National Football League & Miami Dolphins v. The Alley, Inc.*, *supra*, (Declaratory Judgment and Injunction, entered September 16, 1983), the courts found that unauthorized interception and display of copyrighted satellite transmissions constituted copyright infringement. In each case, the games telecast were copyrighted by the National Football League. The unauthorized receivers of the programming were attempting to circumvent the N.F.L.'s "blackout" rule. The courts found that the defendants' activities of displaying the programming in their bars and restaurants were public performances and thus were violations of the copyright holders' exclusive rights under the Copyright Act.

17. Additionally, the Defendant has, as an incident to the public performance of copyrighted motion pictures and other programming, caused the secondary transmission of the primary transmissions of copyrighted programming owned by ESPN and HBO. Since the primary transmissions were controlled and limited to reception by particular members of the public by means of the distribution system described above, and because these acts were done without license or other permission from the copyright owners, each secondary transmission is an additional infringement of the copyright owners' exclusive rights. 17 U.S.C. § 111(b).

18. Defendant's willful acts of publicly performing and causing the secondary transmission of copyrighted works have infringed the copyright owners' rights to the

exclusive performance and display of their audiovisual works.

■ 19. Defendant's conduct does not fall within any exemption to either § 106 or § 111(b). A § 106 public performance of a work is not an infringement under § 110(5) if it is made by "a single receiving apparatus of a kind commonly used in private homes." Since Plaintiffs' transmissions can only be received by regular television sets equipped with special equipment not commonly used in a home, the exemption is inapplicable. *See* Conference Report, H.R. Rep. 94–1733, 94th Cong. 2d Sess. at 75 (1976) U.S.Code Cong. & Admin.News 1976, p. 5688. Furthermore, the exemptions in § 111(b) require an unaltered signal carriage of a broadcast transmission. Since Plaintiffs are not broadcast stations, the defendant is not required to carry the Plaintiff's signals, and because the signals are altered by Defendant's receiving equipment, the exemptions in § 111(b) are inapplicable.

20. Plaintiffs HBO and ESPN have sustained and will continue to sustain substantial injuries, losses and damages to their ownership rights, exclusive distribution rights, and copyrights of their programming. Through such willful acts of infringement, Defendant has not only gained unlawful profits, but has also damaged such copyright owners' reputations and goodwill, and has deprived them of their substantial investment of financial resources, time and effort, and their right and ability to control and receive fees for the performance and display of their audiovisual works.

### TRADEMARK INFRINGEMENT

21. The trade name and trademarks "HBO" and "HOME BOX OFFICE" are registered by the U.S. Patent and Trademark Office. Plaintiff HBO, as a trademark registrant, is a holder of the rights and privileges attaching thereto.

22. A trademark is infringed under 15 U.S.C. § 1114 when a person:

use[s] in commerce [a] reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

*Exxon Corp. v. Texas Motor Exch. of Houston, Inc.,* 628 F.2d 500, 504 (5th Cir. 1980); *Armstrong Cork Co. v. World Carpets, Inc.,* 597 F.2d 496, 500 (5th Cir.), *cert. denied,* 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979); *Roto-Rooter Corp. v. O'Neal,* 513 F.2d 44, 45 (5th Cir.1975). In assessing the likelihood of confusion, a variety of factors are considered. In *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n,* 651 F.2d 311 (5th Cir.1981), the Court identified such factors as the:

type of service mark, similarity of design, similarity of service, identity of service facilities and customers, similarity of advertising media used, defendant's intent and actual confusion.

*Id.* at 314.

■ 23. Defendant infringed HBO's trademarks and trade names when it displayed, during distribution of HBO's programming in its place of business, programming within which the registered trademarks and trade names are prominently displayed. Defendant's acts create a likelihood of confusion since the actual presentation of the programming bearing HBO's trademarks not only uses similar marks, but uses the exact same marks registered to HBO. "[T]he law is established that falsely suggesting the existence of affiliation with a well-known business by usurping the latter's goodwill constitutes both trademark infringement and unfair competition." *Volkswagenwerk Aktiengesellschaft v. Tatum,* 344 F.Supp. 235, 237 (S.D.Fla.1972).

24. Defendant's acts of appropriating the trademarks and trade names of Plaintiff HBO, and the display of its trademarks and trade names in connection with the exhibition, distribution, and advertising of HBO's service in its motel, is likely to, and

intended to cause confusion, mistake, and deception, thereby violating § 1114.

## FEDERAL UNFAIR COMPETITION—LANHAM ACT

25. 15 U.S.C. § 1125(a) prohibits any person from using any false description or representation of any goods or services when such goods or services are caused to enter into commerce, and prohibits persons with knowledge of the falsity of such description or representation from causing or procuring said goods or services to be transported or used in interstate commerce.

■ 26. Defendant has violated 15 U.S.C. § 1125(a) by falsely inferring and describing that the entertainment programming services of the Plaintiffs HBO and ESPN were paid for and lawfully obtained, that the Defendant was authorized to receive and provide Plaintiffs' services to their own customers, and that the Defendant was authorized by HBO and ESPN to receive tangible and intangible benefits from its hotel guests. Consequently, Defendant has unfairly competed with Plaintiffs ESPN and HBO. *See Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368 (5th Cir.1977); *Professional Golfers Assn. v. Bankers Life & Casualty Co.*, 514 F.2d 665 (5th Cir.1975); *B.H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254 (5th Cir. 1971); *Teledyne v. Windmere Prods., Inc.*, 433 F.Supp. 710 (S.D.Fla.1977); *Volkswagenwerk Aktiengesellschaft v. Tatum*, 344 F.Supp. 235 (S.D.Fla.1972).

27. As a result of Defendant's misdescription and misrepresentations concerning Plaintiffs' services, Defendant has caused Plaintiffs to suffer damages, including, but not limited to, a loss of subscription revenue from Defendant, the loss of business goodwill and the cost thereof, a dilution of product identity, exclusivity, and uniqueness, and a usurpation of Plaintiffs' business opportunities with present and future customers.

## STATE LAW CLAIMS

28. Since Plaintiffs have met their burden of demonstrating the Defendant's violations of these federal laws, it is not necessary to reach the pendent state law claims asserted by Plaintiffs.

## INJUNCTIVE RELIEF

■ 29. Under 47 U.S.C. § 705(d)(3)(B)(i), this Court is specifically empowered to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)." *See* 17 U.S.C. § 502(a); 15 U.S.C. § 1116. In order to obtain a preliminary injunction, the movant must generally establish: (1) a substantial likelihood of success on the merits; (2) a showing of irreparable injury unless the injunction issues; (3) proof that threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Productos Carnic, S.A. v. Central American Beef & Seafood Trading Co.*, 621 F.2d 683, 685 (5th Cir.1980); *Compact Van Equip. Co. v. Leggett & Platt, Inc.*, 566 F.2d 952 (5th Cir.1978); *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir.1975). Where the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief, and even if the claim is compensable by damages, an injunction may issue to protect that remedy. *Productos Carnic*, 621 F.2d at 686. The requirements for a permanent injunction to issue, however, are not as stringent. Under Section 705, a movant need only prove a violation or a likelihood of a violation of § 705(a) occurring after December 29, 1984, in order to request an injunction under § 705(d)(3)(B)(i).

30. In the instant action, Plaintiffs have succeeded on the merits by virtue of this order, thereby satisfying their initial burden.

31. Defendant's conduct has in the past and will if unrestrained, continue to cause

irreparable injury to Plaintiffs in obtaining new customers and, controlling unauthorized interception and rebroadcast of their signals. Only an injunction will prevent the continued infringement of HBO's and ESPN's copyrights, as well as any infringements of HBO's trademarks and trade names. Each injury will significantly damage the Plaintiffs' ability to produce, distribute, obtain, and pay for programming suitable for cable television. The business goodwill, reputation, and substantial investment of each of the Plaintiffs in providing the programming services is diminished by Defendant's activities. Furthermore, Plaintiffs are unable to detect or determine when Defendant's establishment is receiving the programming services without payment, how long or often such services are received, or how long such unpaid interception will continue. Plaintiffs have no practical way of terminating or preventing Defendant's interception and retransmission of the satellite programming.

32. Finally, Plaintiffs have no adequate remedy at law for such injuries, consisting of the loss of the value of their business investment, business opportunities, reputation, and goodwill, as well as the exclusive right to market and deliver the copyrighted works by cable transmissions in the service area, resulting in the loss of the value thereof, the benefits and profits to be derived therefrom, and of profits which may not be readily ascertainable by any legal measure of damages.

33. Numerous courts that have considered similar claims in the context of § 605 have consistently found that providers of subscription television services are irreparably injured by activities which encourage, assist, or amount to unauthorized interception of subscription television. The Sixth Circuit has recently declared that the refusal to grant a preliminary injunction in light of unauthorized reception of satellite transmission was error. *Pro Am Sports System, Inc., v. Larry Simone, Inc.*, 738 F.2d 440 (6th Cir.1984).

34. Additionally, as noted in *Home Box Office, Inc. v. Pay TV of Greater N.Y., Inc.*, 467 F.Supp. 525 (E.D.N.Y.1979), absence of justification for violation of clear statutory rights virtually eliminates any necessity for a showing of irreparable harm.

35. The same conclusion follows from the copyright claims. Irreparable harm is presumed when a copyright is infringed. *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3rd Cir.1983); *Rice v. American Program Bureau*, 446 F.2d 685 (2nd Cir.1971); *American Metropolitan Enterprises v. Warner Brothers Records*, 389 F.2d 903 (2nd Cir.1968); *Encyclopaedia Britannica Educational Corp. v. Crooks*, 447 F.Supp. 243 (W.D.N.Y.1976).

36. Unless Defendant's actions are permanently enjoined, HERITAGE's business faces serious economic damage because it depends primarily on the revenues generated by monthly service charges to recover the continuing costs of acquiring copyrighted and other program rights, of transmission facilities for the distribution of its services, of transmission cables and equipment, of employing sufficient personnel to install and maintain receiving equipment in good operating order, and other operating costs associated with the marketing and distribution of satellite-delivered programming. Similarly, the programming service companies face the loss of their investments and a reduction in revenue for the future acquisition, production, and distribution of audiovisual works. None of these costs are incurred by Defendant in its unlawful activities.

37. This Court additionally concludes that Plaintiffs have suffered damages, including attorneys' fees and costs in the prosecution of this action. Plaintiffs have suffered compensatory damages in the amount of $40,000.00, including attorneys' fees and costs.

Based upon the foregoing Findings of Fact and Conclusions of Law,

It is hereby ORDERED and ADJUDGED that this Court permanently enjoins Defendant and its partners, subsidiaries, affil-

iates, officers, agents, representatives, servants, employees, privies, and all persons in active concert and participation with them from:

    A. Intercepting, receiving, appropriating, converting to their own use, or retransmitting, divulging or using any satellite-delivered transmissions of Plaintiffs' programming or signals, or any satellite-delivered programming which HERITAGE makes or could make available to the public through its master contracts, without authorization from Plaintiffs;

    B. Assisting, aiding, abetting, or conspiring with any person to intercept, receive, appropriate, convert, or retransmit, divulge or use Plaintiffs' programming or signals, without their authorization;

    C. Intercepting, receiving, appropriating, converting to its own use, or retransmitting or using any copyrighted works or programming transmitted in Plaintiffs' satellite transmissions, without their authorization; and

    D. Assisting, aiding, abetting, or conspiring with any person to intercept, receive, appropriate, convert or retransmit, divulge or use Plaintiffs' copyrighted works, programming, or signals transmitted by satellite, without their authorization.

IT IS FURTHER ADJUDGED that Plaintiffs recover from Defendant the sum of $40,000.00 for compensatory damages, reasonable attorneys' fees and costs.